IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALAMAR RANCH, LLC., ) | Case No. CV-09-004-S-BLW |
| Plaintiff, ) | |
| ) | **MEMORANDUM DECISION** |
| v. ) | **AND ORDER** |
| ) | |
| COUNTY OF BOISE, ) | |
| ) | |
| Defendant. ) | |

## INTRODUCTION

The Court has before it a motion for return of privileged documents and a motion to strike. The motions are fully briefed and at issue. For the reasons expressed below, the Court will grant in part the motion for return of privileged documents and deny the motion to strike.

## BACKGROUND

Plaintiff Alamar Ranch brought this Fair Housing Act lawsuit against Boise County, alleging that the County improperly blocked its attempt to obtain a conditional use permit to construct a treatment facility for troubled youth. Alamar contends that Boise County was swayed by the arguments of an opposition group known as the Opponents of Alamar.

**Memorandum Decision and Order – Page 1**

While Opponents of Alamar is not a party to this action, Alamar subpoenaed their attorney, Dennis Charney, asking for his files. During the production of those documents, Charney alleges that Alamar's counsel obtained some privileged and protected material, and he seeks their return in his motion. That motion requires this Court to determine (1) the scope of protection that can be claimed by a non-party, (2) whether Charney's purported clients were actually his clients, (3) whether the material was privileged, and (4) whether any privilege was waived.

Charney was originally hired by two individuals to oppose the Alamar project before the Boise County Planning and Zoning Commission. After that hearing, Charney was approached by several people from the group Opponents of Alamar that wanted him to represent them. *See Charney Affidavit* at ¶ 4. He agreed to represent them. *Id*. One of those group members, Jeri Kirkpatrick, testified that Charney represented her and her neighbors beginning in late July or early August of 2007. *See Kirkpatrick Affidavit* at ¶ 4. Charney and his clients lived far apart, and hence they often communicated by e-mail. Some of the clients used their home e-mail addresses while Kirkpatrick used, at times, her office e-mail.

Charney prepared a list of those he represented and provided it to Boise County. The list contains over 100 names. *See Attachment 1 to Charney Affidavit.*

**Memorandum Decision and Order – Page 2**

Charney represents that this list identifies the persons Charney represented as clients during the hearings before Boise County on Alamar's conditional use permit application. *See Charney Affidavit.*

Ultimately, Boise County approved the permit but placed conditions on it that Alamar asserts were so onerous as to render the County's decision a constructive denial. Alamar responded by filing this lawsuit and serving the subpoena on Charney.

At the time the subpoena was served, Charney's father was suffering with the end stage of lung cancer. As a result, Charney was traveling back and forth from Colorado to Idaho.

Charney and the counsel for the parties in this case worked out an agreement where Charney would allow counsel to come to his office, review his files, and make copies as they deemed necessary. Charney states that he segregated all privileged documents and placed them in a manila folder, marked on the outside as privileged. Charney did not prepare a privilege log for counsel that would have definitively identified the documents that were off-limits.

Counsel for Boise County visited first, and made no copies of the privileged material. Then on May 15, 2009, counsel for Alamar – Dara Labrum – visited Charney's office. She states that she was directed by Charney's secretary to a large

**Memorandum Decision and Order – Page 3**

box containing Charney's Alamar files. Labrum states that "it was my understanding that the box contained no privileged material." *See Labrum Declaration* at ¶ 6.

Labrum did not read the documents in depth but quickly scanned any that were not duplicates of documents she already had. *Id*. at ¶ 7. She says that she "does not recall a manila folder marked as containing privileged documents." *Id*. at ¶ 8. At any rate, she did make copies of some of the material that Charney considered privileged.

In addition to this discovery, Alamar's counsel also served subpoenas on Kirkpatrick and her employer, the Idaho Housing and Finance Association (IHFA), to obtain copies of those e-mails Kirkpatrick had sent or received through her work address. The IHFA had stored those e-mails on its server, and produced them to Alamar.

Charney discovered that Labrum had copied his privileged documents about two months later, and on July 31, 2009, he demanded the return of the documents. Labrum immediately segregated the documents – she labeled the documents that she copied as exhibits 6 through 9, and the documents provided by the IHFA as exhibits 10 through 12. She provided these documents to the Court for its *in camera* inspection.

**Memorandum Decision and Order – Page 4**

## ANALYSIS

1. **<u>Work Product Doctrine</u>**

While Charney argued in his opening brief that the work product doctrine applies. Rule 26(b)(3) protects attorney "work product" from discovery in certain specified circumstances. The Ninth Circuit has held that the doctrine is applicable only to a party in litigation in which discovery is sought. *See In re California Public Utilities Com'n,* 892 F.2d 778, 781 (9th Cir. 1989). While the Ninth Circuit recognized that the policy behind the Rule was broad – to safeguard the attorney-client relationship by enabling attorneys to record their thoughts and advice candidly and completely – it held that "the language of the rule makes clear that only parties and their representatives may invoke its protection. We are not free to suspend the requirement." *Id*. at 781. Because Charney is not representing any party to this action, he cannot claim protection of the work product doctrine.

2. **<u>Attorney Client Privilege</u>**

Issues concerning application of the attorney-client privilege in the adjudication of federal law are governed by federal common law. *U.S. v. Ruehle*, __ F.3d __ 2009 WL 3152971 (9th Cir. Sept. 30, 2009). This suit is brought under federal law – the Fair Housing Act – and hence the privilege issue is governed by federal common law, not state law. *Id*.

**Memorandum Decision and Order – Page 5**

Under the federal common law standard, Charney has the burden of proving each of the eight elements that comprise the definition of a privileged communication: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived. *Id.* As part of this burden, Charney must prove that the privilege has not been waived. *See Weil v Investment*, 647 F.2d 18, 25 (9th Cir. 1981). A client's "bare assertion that [she] did not subjectively intend to waive the privilege is insufficient to make out the necessary element of nonwaiver." *Id.*

The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). That a person is a lawyer does not make all communication with that person privileged. *Id.* If a person retains a lawyer for advice, a rebuttable presumption arises that the lawyer is retained for legal advice. *Id.* The presumption can be rebutted by a showing that the attorney was retained "without reference to his knowledge and discretion in the law." *Id.* However, the presumption is not rebutted by showing that the attorney was retained to give legal advice about purely business affairs: "A client is entitled

**Memorandum Decision and Order – Page 6**

to hire a lawyer, and have his secrets kept, for legal advice regarding the client's business affairs." *Id*. at 1501.

Charney must first prove that the e-mails and memo set forth in Exhibits 6 through 12 involve communications with clients. Charney has stated to this Court that he provided legal representation to each of the over 100 persons named on the list discussed above provided to Boise County. The communications set forth in Exhibits 6 through 12 all involve persons named on that list. Thus, the Court finds that Charney provided legal representation to the persons communicating with him in the e-mails and memo set forth in Exhibits 6 through 12.

3. **Privilege Waiver Issue – Exhibits 10 to 12**

Alamar argues that if any privilege did exist, it was waived for all the e-mails that were retrieved by the IHFA, Exhibits 10 through 12 (and thus for most of the e-mails in Exhibits 6 through 8, which are identical to those in Exhibits 10 through 12). Alamar points out, accurately, that by becoming an employee of IHFA, Kirkpatrick agreed to the IHFA policy guidelines, one of which states that the IHFA "reserved and intends to exercise the right to review, audit, intercept, access, and disclose all messages created, received, or sent over the e-mail system for any purpose." *See Exhibit 13 to Labrum Declaration.* Kirkpatrick responds that she was unaware that her computer e-mails were ever monitored by the IHFA,

**Memorandum Decision and Order – Page 7**

although she was aware of one other employment-related case of another IHFA employee where monitoring occurred. *See Kirkpatrick Declaration.*

Does use of work e-mail waive any privilege? Although there are no Ninth Circuit cases on-point, cases from other jurisdictions have developed a four factor test to balance the expectation of privacy against the lack of confidentiality: (1) Is there a company policy banning personal use of e-mails?; (2) Does the company monitor the use of its e-mail?; (3) Does the company have access to all e-mails?; and (4) Did the company notify the employee about these policies? *See In re Asia Global Crossing, LTD.*, 332 B.R. 247, 257 (S.D.N.Y. 2005).

Applying similar factors, one court found that an employee waived the attorney-client privilege by communicating with her attorney over her work e-mail system where the company policy clearly notified all employees that e-mails were "subject to monitoring, search or interception at any time . . . ." *Kaufman v SunGard Inv. System*, 2006 WL 1307882 (D.N.J. May 10, 2006). In a similar case, although not involving the attorney-client privilege, a court found that the employee had no reasonable expectation of privacy in files he stored in his personal folder on his computer and in his personal e-mail account because his employer had an "explicit policy banning personal use of office computers and permitting monitoring" and because the employer retrieved such information by

**Memorandum Decision and Order – Page 8**

accessing its own computer network. *See Thygeson v. Bancorp*, 2004 WL 2066746 at *21 (D.Or. Sept. 15, 2004). The court found that the employer "retained the key" to plaintiff's files as it "was able to remotely search [plaintiff's] personal files on the network." *Id.* at *19.

However, an employer with a similar monitoring policy went too far when it accessed e-mails that an employee had sent via her work computer using a personal web-based e-mail account, and the employee worked at home where the employer could not carry out the regular monitoring policy it applied to on-site use. *See Curto v. Medical World*, 2006 WL 1318387 (E.D.N.Y., May 15, 2006). Even when an employer had the ability to monitor an employee's e-mail, one court refused to find a waiver where the employee was communicating with her attorney from a work computer through a personal password-protected web-based e-mail site. *See Stengart v. Loving Care Agency, Inc.,* 973 A.2d 390 (N.J. Super. A.D. 2009).

In the present case, Kirkpatrick did not attempt to protect the confidentiality of the messages by using a web-based password-protected e-mail account. She simply used her work e-mail. Thus, *Stengart* does not apply here, and the Court leaves for another day whether there is waiver when the employee attempts to protect work-based e-mails through a personal password-protected web site.

**Memorandum Decision and Order – Page 9**

This case presents a simple scenario where the IHFA put all employees – including Kirkpatrick – on notice that their e-mails would (1) become IHFA's property, (2) be monitored, stored, accessed and disclosed by IHFA, and (3) should not be assumed to be confidential. While Kirkpatrick states that she was not aware of any company monitoring, *see Kirkpatrick Declaration* at ¶ 7, the Court's earlier discussion of the legal standards makes clear that her "bare assertion that [she] did not subjectively intend to waive the privilege is insufficient to make out the necessary element of nonwaiver." *Weil,* 647 F.2d at 25. It is unreasonable for any employee in this technological age – and particularly an employee receiving the notice Kirkpatrick received – to believe that her e-mails, sent directly from her company's e-mail address over its computers, would not be stored by the company and made available for retrieval.

Accordingly, the Court finds that Kirkpatrick waived the privilege for those messages she sent from her work computer. With regard to the e-mails Charney sent to her, there is no question that her address – "JeriK@IHFA.org" – clearly put Charney on notice that he was using her work e-mail address. Employer monitoring of work-based e-mails is so ubiquitous that Charney should have been aware that the IHFA would be monitoring, accessing, and retrieving e-mails sent to that address. Given that, the Court finds that Charney's e-mails sent to

Kirkpatrick's work e-mail are likewise unprotected by any privilege.

There are, however, further e-mails retrieved by the IHFA that were sent to Charney by other members of Opponents of Alamar, with copies to Kirkpatrick at her work e-mail address. For example, Exhibit 10 contains an e-mail from Cheryl Gammon to Charney that was copied to Kirkpatrick. As another example, Exhibit 11 consists of a single e-mail sent by the Chrys and Rip Pereidas to Charney, copied to Kirkpatrick at her work e-mail address. The Peredias and Gammon were, like Kirkpatrick, clients of Charney.

There is no evidence that the Pereidas and Gammons were aware – or should have been aware – that by copying Kirkpatrick on their e-mails to Charney they were exposing their e-mails to IHFA scrutiny. As far as the Pereidas and Gammon were concerned, they were having a confidential discussion with their attorney. The Court refuses to extend the constructive knowledge that Charney had about the monitoring of work-based e-mails to the Pereidas and Gammon – laypersons are simply not on "high-alert" for such things as attorneys must be. Accordingly, the Court finds no waiver of the privilege as to the e-mails retrieved by the IHFA that were sent by Charney's clients other than Kirkpatrick and copied to her at her work e-mail address.

The final category of e-mails retrieved by the IHFA is e-mails sent directly

**Memorandum Decision and Order – Page 11**

to Kirkpatrick's work e-mail by other members of Opponents of Alamar, copying Charney. The analysis of these e-mails is similar to those on which Kirkpatrick was merely copied. There is no evidence that the sender knew – or should have known – that the e-mails sent directly to Kirkpatrick would be stored and retrieved by the IHFA. Hence, there is no waiver as to those e-mails that were sent directly to Kirkpatrick by other members of Opponents of Alamar.

4. **Privileged Status of IHFA E-mails**

The Court now turns to consider whether those e-mails that were retrieved by the IHFA, and for which any privilege has not been waived, are in fact privileged. Those e-mails fall into two categories.

The first category contains e-mails sent by Charney's clients other than Kirkpatrick directly to Charney, and copying Kirkpatrick at her work e-mail address. The senders of the e-mails – the Pereidas and Gammon – were clients of Charney's and the subject matter of the e-mails concerns his legal representation of their interests in the Boise County dispute. While Alamar argues that Charney was a mere lobbyist, the Court finds that he was retained as an attorney for his legal advice on how to defeat Alamar's permit petition. Thus, the e-mails from the Pereidas and Gammons to Charney in Exhibits 10 and 11 that were merely copied to Kirkpatrick are privileged and must be returned.

**Memorandum Decision and Order – Page 12**

The second category of e-mails retrieved by the IHFA is e-mails sent directly to Kirkpatrick's work e-mail by other members of Opponents of Alamar, copying Charney. The senders and primary recipients were clients of Charney's. While Charney was merely copied, the discussion is about matters directly relevant to his legal representation in the Boise County matter. The e-mails are akin to two clients holding a conversation about their legal matter that they want their attorney to overhear. Hence, these e-mails are privileged.

5.      **Exhibits 6 through 9 – E-mails & Memo Copied by Labrum**

The other Exhibits – Exhibits 6 through 9 – are documents copied by Alamar's counsel Dara Labrum at Charney's office, as described above. Charney argues that Labrum – unlike Boise County's counsel – ignored the "privilege" label affixed to the manila folder in which these documents were kept. But any assertion of overreaching on Labrum's part is unpersuasive for three reasons. First, Labrum states that it was her understanding that the box contained no privileged material, and she recalls no manila folder or segregated documents. Second, reliance on a label affixed to a manila folder to protect privileged documents is inadequate protection when (1) the manila folder is maintained in the same box as the non-privileged documents and (2) no other notice – written or verbal – was given by Charney to Labrum to alert her that the box contained an off-limits manila folder.

**Memorandum Decision and Order – Page 13**

Third, Charney never prepared a privilege log. While he is not a party and hence not subject to Rule 26(b)(5)'s requirement that he prepare a privilege log, the Rule at least sets forth a "best practice" that, if followed, would have identified each privileged document and left no room for the misunderstanding that arose here.

Given these circumstances, the Court can find no impropriety in Labrum's copying of the documents. Turning to the claim of privilege in Exhibits 6 through 9, the Court finds that Exhibit 6 includes the identical back-and-forth e-mails between Charney and Kirkpatrick at her IHFA e-mail address that were discussed above. The Court concluded above that these e-mails were not privileged. Exhibit 6 also includes an e-mail from Gammon to Charney, also discussed above, that the Court found to be privileged. Thus, Exhibit 6 contains a mix of privileged and non-privileged material.

Exhibit 7 includes one e-mail that is identical to that found in Exhibit 11, discussed above, and is hence privileged. The remaining e-mails in Exhibit 7 are between Charney and the Pereidas. As discussed, the Pereidas are clients of Charney's, and the subject matter of the e-mails concerns Charney's legal representation of the Pereidas on the Boise County matter. Accordingly, all the e-mails in Exhibit 7 are protected and must be returned.

Exhibit 8 contains two e-mails from Gammon, discussed above and identical

**Memorandum Decision and Order – Page 14**

to those retrieved by the IHFA, where she is conversing with other clients and also with Charney. As discussed, those e-mails are privileged and the privilege is not waived by copying Kirkpatrick at her work e-mail address. Exhibit 8 also includes an e-mail from Kirkpatrick to Gammon sent from Kirkpatrick's work e-mail address; any privilege was waived by use of the work e-mail.

Exhibit 9 is not an e-mail but a memo of talking points labeled "Slime Bullets." According to Charney, the memo was prepared and sent to him by his client Ralph Pereida. *See Charney Affidavit* at ¶ 25. The memo's subject matter shows that it was prepared to assist Charney in his legal representation of the Pereidas and others before Boise County. There is no evidence indicating waiver. Accordingly, the Court finds that it is privileged and must be returned.

### 6. Motion to Strike

Alamar moved to strike Kirkpatrick's Declaration statements that she was unaware of any monitoring of computers by the IHFA. The Court has interpreted her statements in the Declaration to be limited to her own knowledge and not to be assertions about company-wide practices. So limited, her Declaration is not subject to a motion to strike, and the motion will be denied.

### 3. Conclusion

In conclusion, the Court's findings are set forth in the table below:

**Memorandum Decision and Order – Page 15**

| Rulings On *In Camera* Exhibits |||
|---|---|---|
| **Exhibit** | **Privileged** | **Not Privileged** |
| 6 | (1) e-mail from Gammon to Charney. | (1) e-mail from Kirkpatrick to Charney; (2) e-mail from Charney to Kirkpatrick. |
| 7 | All | – |
| 8 | (1) e-mail from Gammon to Kirkpatrick dated 12/31/07; (2) e-mail from Gammon to Pereidas dated 12/30/07 | (1) e-mail from Kirkpatrick to Gammon dated 12/31/07 |
| 9 | All | – |
| 10 | (1) e-mail from Gammon to Charney. | (1) e-mail from Kirkpatrick to Charney; (2) e-mail from Charney to Kirkpatrick. |
| 11 | All | – |
| 12 | (1) e-mail from Gammon to Kirkpatrick dated 12/31/07; (2) e-mail from Gammon to Pereidas dated 12/30/07 | (1) e-mail from Kirkpatrick to Gammon dated 12/31/07 |

# ORDER

In accordance with the Memorandum Decision,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to return privileged documents (Docket No. 28) is GRANTED IN PART AND DENIED IN PART consistent with the decision above.

IT IS FURTHER ORDERED, that the motion to strike (Docket No. 32) is DENIED.

DATED: **November 2, 2009**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order – Page 17**