Andrew C. Brassey, ISB No. 2128
John M. Howell, ISB No. 6234
BRASSEY, WETHERELL & CRAWFORD LLP
203 W. Main Street
P.O. Box 1009
Boise, Idaho 83701-1009
Telephone: (208) 344-7300
Facsimile: (208) 344-7077

Attorneys for County of Boise

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ALAMAR RANCH LLC, an Idaho limited liability company; and YTC, LLC, an Idaho limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF BOISE, a political subdivision of the State of Idaho<br><br>Defendant. | Case No. 1:09-CV-00004<br><br>**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE (#9) RE: PLAINTIFFS' EXPERT CHARLES WILHOITE** |

COMES NOW the Defendant in the above-entitled action, by and through its counsel of record, Brassey, Wetherell & Crawford, LLP, and submits this Memorandum in Support of Defendant's Motions in Limine (#9) Re: Plaintiffs' Expert Charles Wilhoite.

I. **INTRODUCTION**

Defendant submits this memorandum in support of its motion to exclude the testimony of Plaintiffs' expert witness Charles Wilhoite. This motion is based upon the failure of the proposed expert opinion to meet the standards originally announced under *Daubert v. Merrell Dow*

*Pharmaceuticals., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), and now incorporated into Federal Rule of Evidence 702.

## II. ARGUMENT & AUTHORITY

Mr. Wilhoite prepared a report dated September 3, 2009, that presumably contains the substance of his expected testimony. So far as it pertains to Defendant's motion, the report contains the results of Mr. Wilhoite's effort "to estimate the economic damages that might have been incurred by Alamar and YTC as a result of certain alleged acts committed by Boise County. (Wilhoite Depo., p.11, LL.9-12; p.12, LL.3-5, 9-11).[1] More particularly, the instant motion is directed to the exclusion of Mr. Wilhoite's testimony as it regards estimated future business loss for Alamar Ranch (Wilhoite Rpt, exhibit 7, page 29) and for YTC (Wilhoite Rpt., exhibit 10a, page 32). While the report is clad in daunting tables and arcane terms and language, ultimately its validity depends upon a fairly simple set of data: the net revenue or income stream generated by the residential treatment center that would hypothetically have been constructed by YTC in Boise County and leased to and operated by Alamar. It is patent from examining the pertinent exhibit to the Wilhoite Report that the income hypothetically lost by YTC (and claimed in this suit) would be supplied through the "Alamar Ranch Lease Revenue" received by YTC from Alamar. (Wilhoite Rpt., exhibit 10a, page 32). This raises the obvious question--unaccounted for in the blizzard of figures appearing in the Wilhoite Report--of what would become of the income claimed by YTC if Alamar Ranch were not the cash cow projected by management (which were essentially the projections adopted by Mr. Wilhoite, see the discussion following) or, even more problematic, if Alamar Ranch were not profitable at all. Since that possibility is not addressed by Mr. Wilhoite's Report, we are left with the conclusion that the

---

[1] Referenced portions of Mr. Wilhoite's deposition, as well as Mr. Wilhoite's Report, are attached to the Affidavit of John M. Howell Filed in Support of Defendant's Motions in Limine.

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE (#9) RE: PLAINTIFFS' EXPERT CHARLES WILHOITE - 2

conclusions proffered by Mr. Wilhoite with respect to lost income or profits depend upon the income projections for Alamar Ranch's residential treatment center. These projections appear at the top of exhibit 7, page 29 of the Wilhoite Report and generally show an operating loss in 2009 and sharply escalating profits thereafter through 2013.

It is Boise County's abiding belief that Mr. Wilhoite's opinions as to operating profits lost to Alamar Ranch (and by extension to YTC) as a result of its abandoning the Alamar Ranch venture do not meet the *Daubert* requirements for admissibility and thus such opinions should be excluded. First, the projections that he endorses are not really those of Mr. Wilhoite himself:

> A. [By Mr. Wilhoite] My projections are--basically management's projections were moved out.
>
> Q. [By Mr. Brassey] I don't care whether they've been moved. Your projections are based on your assumptions?
>
> A. I'm not trying to be difficult. They're not really my projections. The only thing I did with the projections was move them out. But if there are material errors with regard to the projections, there would be a material issue with regard to the conclusion. I think that's the best way to put it.

Deposition of Charles Wilhoite, p.87, LL.8-18; *see also* p.76, L.25 - p.78, L.19; and p.99, L.4 - p.101, L.7. This testimony is important to keep in mind as other aspects of the *Daubert* inquiry are analyzed. Mr. Wilhoite cannot recall that he has ever done an evaluation of a residential treatment center for lost profits or lost business opportunity and that accordingly it is possible this is his first evaluation involving such a facility (keeping in mind that it's not his evaluation, but that of management, as shown above). Deposition of Charles Wilhoite, p.15, L.12 - p.16, L.8.

Mr. Wilhoite's adoption of management's income projections, extended six months into the future, simply lacks reliability. The party offering the expert must demonstrate "objective, independent validation of the expert's methodology." *Daubert v. Merrell Dow Pharmaceuticals,*

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE (#9) RE: PLAINTIFFS' EXPERT CHARLES WILHOITE - 3

*Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995), *cert. denied* 516 U.S. 869, 116 Sup. Ct. 189 (1995). Essential to understanding the projections of management and thus of Mr. Wilhoite is the assumption that (i) a certain number of available beds at Alamar Ranch would be filled upon the facility's opening in 2008 (management) or six months later in 2009 (Wilhoite) at $7,500 per month and that an increasing number of beds would be filled at the significantly higher price of $12,000 per month just a year later.  Deposition of Charles Wilhoite, p.69, LL.5-19; p.101, L.8 - p.102, L.19; Wilhoite Report, exhibit 4, p.23.  It must be evident that a residential treatment center such as Alamar Ranch is essentially *sui generis*, a unique type of facility, dependent for its success or lack thereof upon a discrete set of considerations: pricing of tuition, location and environment, faculty and other staff, access, facilities, programs, marketing effort and success, and operating expense.  It is apparent that the only possible meaningful source for Mr. Wilhoite's confirming the revenue projections of management as to a residential treatment center *of this nature* was an unrecorded telephone conversation that he had with Lon Woodbury, an educational consultant in Bonner's Ferry, on the day before Mr. Wilhoite's deposition was held.  *Id.*, p.19, LL.2-8.  This conversation occurred after Mr. Wilhoite's report was prepared and subsequent to the expert disclosure deadline in this case. *Id.*, p.25, LL.1-6.  The untimely disclosure should provide grounds in and of itself to strike Mr. Wilhoite's opinions, or at the very least portions of Mr. Wilhoite's opinions.

      Mr. Wilhoite asserts that the untimely conversation with Mr. Woodbury "confirmed" his earlier conclusions, but the fact of the matter is that Mr. Woodbury had no involvement in the actual operation of a residential treatment facility and to a large extent relied upon the reputation of Amy Jeppesen, the executive director of Alamar Ranch, to validate the assumptions made by management as to enrollment and pricing.  *Id.*, p.38, LL. 8-21.  Mr. Wilhoite never bothered to talk to Ms. Jeppesen herself.  *Id.*, p.39, LL.13 - p.40, L.24.  Ms. Jeppesen herself was less than optimistic about

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE (#9) RE: PLAINTIFFS' EXPERT CHARLES WILHOITE - 4

the viability of Alamar Ranch, particularly if it were not constructed to the capacity demanded by management. *Id.*, p.64, L.18 - p.65, L.9. Although Ms. Jeppesen's view of the industry would clearly have given no support to the projections of management, and by extension, of Mr. Wilhoite, Mr. Wilhoite attempts to declare that Ms. Jeppesen's opinions are not necessarily inconsistent with his own. The court may judge the persuasiveness of Mr. Wilhoite's efforts in this regard (and his reliability generally) by Mr. Wilhoite's testimony. *Id.*, p.66, L.5 - p.70, L.22. Ultimately, Mr. Wilhoite is simply willing to assume that Alamar Ranch would provide a superior level of service and that "they're going to get the rates they were targeting." *Id.*, p.112, L.8 - p.113, L.4.

While the Plaintiffs will doubtless point to Mr. Wilhoite's discussions with other individuals--principally Messrs. Oaas and Tverdy--to validate the reliability of the management's projections, his deposition testimony shows that none of them had any experience with residential treatment centers for troubled youth. *Id.*, p.18, L.18 - p.23, L.24. Similarly, the effort of Mr. Wilhoite to predicate his endorsement of management's projected income upon comparison with the profit (or operating) margins of other companies plainly lacks reliability. The companies considered were publicly traded corporations, vastly larger and more mature than Alamar Ranch, and having a diverse mix of holdings rather than merely one venture. And the one company identified by Mr. Wilhoite as most similar in size to Alamar Ranch, Children's Behavioral Health, Inc., "provided home and school based social services" at the actual homes of the targeted children, rather than at a geographically removed residence campus. *Id.*, p.139, L.17 - p.140, L.11.

Another point that inheres in the timing of Mr. Wilhoite's report is that it was prepared a year after the onset of the Great Recession, which struck in the latter part of 2008. One intuitively must question the reliability of an approach that adopted projections of management that were developed before the national economic plunge, but that essentially makes no correction for it or any attempt

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE (#9) RE: PLAINTIFFS' EXPERT CHARLES WILHOITE - 5

to ascertain the extent to which the projections would have to be modified to sustain any validity in the actual economic environment that persists to this day--an environment that is not hypothetical and cannot in any sense be said (or assumed) to be similar to that hypothesized when management's conclusions about an as-yet non-existent business were developed.

Mr. Wilhoite's proposed testimony is not based upon a reliable methodology and cannot be shown to assist the trier of fact to understand the evidence or to determine a fact in issue. Accordingly, the Motion of Boise County to exclude that testimony should be granted.

### III. CONCLUSION

Based on the foregoing, Defendant respectfully requests that the Court grant its Motion in Limine (#9) Re: Plaintiffs' Expert Charles Wilhoite.

DATED this 8th day of November, 2010.

BRASSEY, WETHERELL & CRAWFORD

By_____
Andrew C. Brassey, Of the Firm
Attorneys for Defendant County of Boise

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ___8th___ day of November, 2010, I served a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE (#9) RE: CHARLES WILHOITE,** upon each of the following individuals by causing the same to be delivered by the method and to the addresses indicated below:

| | |
|---|---|
| Thomas A. Banducci | ____ U.S. Mail, postage prepaid |
| tbanducci@bwslawgroup.com | ____ Hand-Delivered |
| Wade L. Woodard | ____ Facsimile |
| wwoodard@bwslawgroup.com | __✓__ CM-ECF |
| Banducci Woodard Schwartzman PLLC | ____ Email |
| 802 W. Bannock Street, Suite 500 | |
| Boise, Idaho 83702 | |

_____
Andrew C. Brassey

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION IN LIMINE (#9) RE: PLAINTIFFS' EXPERT CHARLES WILHOITE - 7